978 F.2d 116
 61 USLW 2315, 27 Collier Bankr.Cas.2d 1446,
23 Bankr.Ct.Dec. 1037
 In re MARKET SQUARE INN, INC.,
Glass Plaza Associates, a Limited Partnership, Appellant.
 No. 91-3810.
 United States Court of Appeals,
Third Circuit.
 Argued May 14, 1992.
Decided Oct. 27, 1992.
 
 James A. Lewis (argued), John R. Fielding, Rothman, Gordon, Foreman & Groudine, P.C., Harold Gondelman, Pietragallo, Bosick & Gordon, Pittsburgh, Pa., for appellee.
 M. Richard Dunlap (argued), Diane J. Christel, Dickie, McCamey & Chilcote, P.C., Pittsburgh, Pa., for appellant.
 Before: STAPLETON, ALITO and ROTH, Circuit Judges.
 OPINION OF THE COURT
 ROTH, Circuit Judge:
 
 
 1
 This appeal requires us to evaluate our jurisdiction to entertain an appeal from the midst of a bankruptcy proceeding. Debtor/Appellee Market Square Inn ("MSI") asks us to affirm an order of the United States District Court for the Western District of Pennsylvania, holding that MSI's principal asset, a lease with its landlord, Appellant Glass Plaza Associates (GPA), was improperly terminated prior to MSI's voluntary petition for bankruptcy. The bankruptcy court severed the issue of proper termination from MSI's larger (unresolved) quest to assume the lease in bankruptcy. Thus, the court decided only that the lease survived, not whether it could be assumed. We find nonetheless that the district court's order regarding the validity of the lease is appealable and that our jurisdiction over the appeal is proper.
 
 I.
 
 2
 MSI is a debtor in possession of certain space in a new office complex, PPG Building Four ("PPG 4"), in Pittsburgh. GPA is a limited partnership in which PPG Industries, Inc., is the general partner. GPA is also the landlord for PPG 4. GPA and MSI entered into a Lease Agreement ("the Agreement") on April 5, 1984, whereby MSI would lease space in PPG 4 to construct and run a first-class restaurant. During the negotiations with GPA, MSI emphasized PPG 4's inadequacies as a restaurant site. Specifically, MSI noted that PPG 4 was designed as office space and this left no room for a restaurant kitchen. The parties nonetheless went forward with the Agreement, and MSI signed a lease with GPA which provided that rent payments would commence at a now-disputed future date. As events have transpired, that date could not now be earlier than December 31, 1984.[1] MSI subsequently negotiated for kitchen space in a Pittsburgh Parking Authority ("the Parking Authority") parking garage adjacent to PPG 4. MSI leased this space from the Parking Authority on September 25, 1984.[2] Borg-Warner Acceptance Corporation ("Borg-Warner") agreed to provide $2.1 million in financing for the project.
 
 
 3
 After signing the lease with the Parking Authority in September 1984, MSI commenced designing the restaurant. GPA, acting under its interpretation of the Agreement, began billing MSI for rent in January 1985. When MSI failed to pay in January and early February, GPA sent a letter to Borg-Warner notifying it of MSI's "default." In early March 1985, MSI secured a temporary injunction from a Pennsylvania Court of Common Pleas, prohibiting GPA from sending Borg-Warner further such notices. Under protest, MSI then made one payment to GPA representing two months' rent. No rental payments were made thereafter.
 
 
 4
 MSI submitted Preliminary Drawings of the restaurant to GPA in April 1985. GPA rejected the drawings on May 2, 1985. Borg-Warner terminated MSI's funding on June 5, 1985. MSI attempted to negotiate alternative funding with United States Steel Credit Corporation, but GPA terminated the lease with MSI on July 15, 1985, citing inter alia MSI's failure to pay rent under the Agreement. Ten months later, on May 5, 1986, MSI filed for bankruptcy under Chapter 11 of the Bankruptcy Code.
 
 
 5
 Before the bankruptcy court, MSI filed a motion to assume the Agreement with GPA under section 365(a) of the Bankruptcy Code. 11 U.S.C.A. § 365(a).[3] The bankruptcy judge ordered that the trial on the motion be bifurcated to resolve the issue of the lease's validity before litigating MSI's ability to assume the lease. After a 6-day trial in March 1987, the bankruptcy court decided that GPA's pre-petition termination of the Agreement was wrongful and that the Agreement did exist for MSI to assume.
 
 
 6
 The bankruptcy court found that MSI's rental payments were not due to begin on January 1, 1985, despite the admittedly unambiguous provision to this effect in the contract. This finding was based upon the fact that the parties intended to defer the rent date by the amount of time it took MSI to negotiate kitchen space with the Parking Authority. This intent was obvious, the court stated, because the parties included in an appendix to the Agreement a clause exonerating MSI from liability for delay in securing kitchen space.[4] Since the negotiations with the Parking Authority took nearly six months, payment of rent would not begin until June 1985, rather than in January as stated in the lease. Because in March MSI paid GPA an amount representing two months rent, an amount which the court found not actually to be due until June, that payment satisfied MSI's nonpayment of rent in June and July of 1985. The court reasoned that this payment rendered GPA's July termination of the Agreement unlawful. As a consequence, the lease existed for MSI to assume after it had filed for bankruptcy.[5] On October 8, 1991, the district court affirmed the bankruptcy court's construction of the Agreement. GPA appeals.
 
 II.
 
 7
 There is some question whether the district court's determination that the lease remains in existence has value to the parties independent of the resolution of the issue of assumption. For this reason, we must initially determine whether the district court's order is final and appealable under 28 U.S.C.A. § 158(d). The parties both argue that the district court's order is appealable under the more liberal rules governing bankruptcy appeals.
 
 
 8
 Pursuant to 28 U.S.C.A. § 158(a), district courts have jurisdiction to hear appeals from final judgments or orders and, "with leave of the court," from interlocutory orders of bankruptcy judges. In turn, courts of appeals have jurisdiction over appeals in bankruptcy matters from final decisions of the district courts. See 28 U.S.C.A. § 158(d); Connecticut Nat'l Bank v. Germain, --- U.S. ----, 112 S.Ct. 1146, 1148, 117 L.Ed.2d 391 (1992).
 
 
 9
 This court has "consistently recognized that finality must be viewed pragmatically in bankruptcy appeals." Wheeling-Pittsburgh Steel Corp. v. McCune, 836 F.2d 153, 157 (3d Cir.1987). This is so because "bankruptcy cases 'frequently involve protracted proceedings with many parties participating. To avoid the waste of time and resources that might result from viewing discrete portions of the action only after a plan of reorganization is approved, courts have permitted appellate review of orders that in other contexts might be considered interlocutory.' " Id. at 158, quoting In re Amatex Corp., 755 F.2d 1034, 1039 (3d Cir.1985). In In re Meyertech Corp., 831 F.2d 410, 414 (3d Cir.1987), we set out several factors to be weighed in evaluating the propriety of jurisdiction in a bankruptcy case:
 
 
 10
 Our jurisdiction is properly invoked by balancing a general reluctance to expand traditional interpretations regarding finality and a desire to effectuate a practical termination of the matter before us. Factors to evaluate in this weighing process are the impact upon the assets of the bankrupt estate, the necessity for further fact-finding on remand, the preclusive effects of our decision on the merits on further litigation, and whether the interest of judicial economy would be furthered.
 
 
 11
 The "most important" of these factors is the impact upon the assets of the bankrupt estate. Id. See Century Glove, Inc. v. First American Bank, 860 F.2d 94, 98 (3d Cir.1988). See also Wheeling-Pittsburgh, 836 F.2d at 158 (additionally considering whether delay in the final resolution of the matter would adversely affect the debtor's ability to reorganize).
 
 
 12
 Thus we have found jurisdiction, for example, over an order partially remanding the calculation of an award to the bankruptcy court, Meyertech, 831 F.2d at 412; over an order holding that the debtor was a railroad for purposes of federal bankruptcy law, Wheeling-Pittsburgh, 836 F.2d at 158; over an order denying a motion to dismiss a debtor's Chapter 7 case, In re Christian, 804 F.2d 46, 47-48 (3d Cir.1986); over an order approving a broker's application for payment of administrative expenses but which remanded for further proceedings regarding the amount of compensation, F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 104-05 (3d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); and over an order disqualifying trustee and counsel from employment in a jointly-administered bankruptcy cases but which remanded for further inquiry into allowable compensation, In re BH & P, Inc., 949 F.2d 1300, 1306-07 (3d Cir.1991). We note that our concerns here mirror those we expressed in F/S Airlease:
 
 
 13
 A resolution of this discrete dispute at this time would further the goal of judicial economy because it could obviate the need for further action by the bankruptcy court. Even more important, the order has a significant impact on the assets of the bankruptcy estate; the amount [sought] represents a substantial portion of the assets of the estate, and an award ... at this point will severely affect the rights of the ... creditors. In fact, a delay in the final resolution of this matter could have an adverse impact on the debtor's successful reorganization under Chapter 11.
 
 
 14
 F/S Airlease, 844 F.2d at 104.
 
 
 15
 The factors set out above, when applied to the district court order in this case, weigh in favor of jurisdiction. First, the question of the lease's validity greatly impacts the assets of the estate. If we assume jurisdiction over the appeal and were then to determine that the lease had been properly terminated, MSI's ability to reorganize would effectively be foreclosed because the potential of the lease is the only substantial asset in the debtor-in-possession's estate. We believe that it would be very difficult under the circumstances for MSI to obtain a commitment from a lender without this Court's affirmation of the validity of the lease. If, on the other hand, we were to determine that the lease was still in effect, MSI would have a confirmed asset that might permit it to find the financing to go forward with the restaurant.
 
 
 16
 We conclude that, as a matter of practicality, the issues of the validity and the assumability of the lease are not questions that can be decided at the same time by the bankruptcy judge. Although it is not clear from the record, we presume that MSI does not still have a financing commitment from a lender. Without financing, MSI is not in a position to assume the lease. As was mentioned at oral argument, MSI will have to shop the lease in order to attract a new source of financing. When and if MSI does find a lender, the question of assumability of the lease will be ripe to be decided by the bankruptcy judge. The resolution of this issue of assumption or rejection will be a matter of business judgment by the bankruptcy court, see Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943), depending upon factors such as the terms of the lease, the conditions of any financing available, and the viability of the business.
 
 
 17
 Since as a practical matter MSI cannot begin to solicit funding to facilitate assumption of the lease until the validity of the lease is determined, this issue is independent of MSI's ability to assemble a plan of reorganization. Because serious questions about the Agreement exist, the bankruptcy court's separate determination of the termination and assumability issues advances judicial efficiency.[6] We acknowledge that concerns about runaway appeals are legitimate, see BH & P, 949 F.2d at 1319-20 (Hutchinson, J., concurring). However, resolving the issue of the status of the lease with GPA is necessary before MSI can have any hope of effectively moving ahead with its reorganization. We find, therefore, that the bankruptcy court's order is appealable pursuant to 28 U.S.C. § 158.
 
 III.
 
 18
 Unfortunately, although a majority of the panel agrees that the appeal is properly before us, we are equally divided regarding the district court's determination that the lease was improperly terminated. Of the judges who feel we have jurisdiction to hear the appeal, one would vote to affirm the decision and one would vote to reverse.[7] Consequently, the order upholding the validity of the Agreement will be affirmed. See United States v. Zolin, 491 U.S. 554, 561, 109 S.Ct. 2619, 2625, 105 L.Ed.2d 469 (1989); United States v. Bazzano, 712 F.2d 826 (3d Cir.1983) (in banc), cert. denied, sub nom. Mollica v. United States, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984); United States v. Mandel, 609 F.2d 1076, 1076-77 (4th Cir.1979) (Murnaghan, J., statement regarding denial of rehearing) ("It is nearly as important that cases be decided, and the decisions be accorded finality, as it is that they be disposed of absolutely correctly. Courts have, as a consequence, adopted a rule of necessity that an evenly divided appellate court, although it cannot render a decision, affirms the judgment."), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980).
 
 IV.
 
 19
 For the foregoing reasons, we will affirm the order of the district court and remand to the bankruptcy court for further proceedings.
 
 ALITO, Circuit Judge, concurring:
 
 20
 In my view, In Re BH & P Inc., 949 F.2d 1300 (3d Cir.1991), and F/S Airlease II, Inc. v. Simon, 844 F.2d 99, 103 (3d Cir.), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988), constrain us to hold that appellate jurisdiction is present here. I therefore concur in the opinion of the court.
 
 
 21
 STAPLETON, Circuit Judge, dissenting.
 
 
 22
 The debtor, MSI, filed a motion in the bankruptcy court "for leave to assume a lease." After the filing of an answer to that motion, it was the subject of two pretrial conferences and was set for trial on March 16, 1987. A week before trial, the court entered an order directing that the trial would be limited to the issue of "whether there is an existing lease subject to assumption or rejection by the debtor." The order further provided that if a lease were found to exist, the court would thereafter determine "the effect of an assumption of the lease [upon the debtor] and how the debtor proposes to cure any defaults thereunder." A.000095.
 
 
 23
 After trial, the bankruptcy court determined that a lease did exist on the date the petition was filed. However, before it could address the other issues involved in determining whether the "leave to assume the lease" should be granted, GPA filed an appeal to the district court. In doing so, it sought no permission from the district court for an interlocutory appeal and none was granted. The district court affirmed the "opinion and order" of the bankruptcy court and remanded so that that court could decide the motion for leave to assume the lease.
 
 
 24
 Had GPA successfully sought permission to appeal an interlocutory order to the district court, as I believe it should have done if it wanted immediate review, we would have no jurisdiction to consider the district court's disposition of the appeal. In re Comer, 716 F.2d 168, 172 (3rd Cir.1983). Both GPA and the district court, however, treated the bankruptcy court's order regarding the existence of the lease as a final order. GPA accordingly asserts that we have jurisdiction under 28 U.S.C. § 158(d) which gives us jurisdiction to review "all final decisions, judgments, orders, and decrees" entered by a district court that has exercised its appellate jurisdiction over an order of its bankruptcy court. It follows that if either the order of the bankruptcy court finding an existing contract or the order of the district court affirming that view and remanding for action on the pending motion is a non-final order, we have no jurisdiction. I would hold that neither is a final order.
 
 
 25
 I, of course, acknowledge that our cases have taken a more flexible view of finality in the context of a bankruptcy proceeding than in the context of other civil litigation. As we observed in In re Brown, 803 F.2d 120, 122 (3d Cir.1986), however:
 
 
 26
 [In re] Marin Motor Oil [, Inc., 689 F.2d 445 (3d Cir.1982) ] and Amatex stand for the proposition that this court must consider finality functionally in bankruptcy cases. 755 F.2d at 1039. Because bankruptcy cases involve numerous parties with different claims, the court must consider the practical consequences of delaying resolution of the issue presented. Where the issue is likely to affect the distribution of the debtor's assets, or the relationship among the creditors, the most pragmatic response will usually be to hear the appeal immediately.
 
 
 27
 This does not mean, however, that there are no jurisdictional limits imposed by section 158(d). District courts may hear both final and interlocutory orders from the bankruptcy courts under section 158(a) of the Bankruptcy Code. The circuit courts, on the other hand, are limited to final orders. Congress, therefore, intended to restrict the ability of parties to a bankruptcy proceeding to appeal district court orders.
 
 
 28
 My concern is that if the two orders underlying this appeal are determined to be final, there will be no jurisdictional limits imposed by section 158(d) in the Third Circuit, and a careful lawyer for the losing party will be constrained to file an appeal whenever an order of a bankruptcy court decides some, but less than all, of the issues on which an application for relief depends.
 
 
 29
 The issue of whether there was a contract existing at the time of the filing of the petition in this matter has no present significance to the parties to this appeal or to the estate independent of the issue of whether the debtor can assume the lease. The bankruptcy court simply chose to bifurcate the only dispute between the parties into subissues and to resolve one of them before addressing the others. This may well have made sense from a case management perspective, and I do not fault the bankruptcy court for doing so. Nor can I fault GPA for appealing the court's decision on the first subissue; given this court's jurisprudence in the area, counsel could simply not assume the risk of losing the client's right to appeal as a result of a subsequent determination that the order was final and that the time for appeal had expired 30 days thereafter. I do, however, fault the district court for entertaining the appeal. That court did the parties no favor by doing so. If the district court had paused long enough for the bankruptcy court to decide the motion for leave to assume the lease, the only dispute between the parties would now be before us for decision. As it is, the parties face the prospect of a second appeal from the bankruptcy court's disposition of the motion and, at the rate this case has been going, they are likely still to be litigating their rather straightforward dispute two years from now.
 
 
 30
 Today's decision will have no impact whatever on the debtor, its creditors, or the assets of the estate until there has been further significant fact finding by the bankruptcy court. Moreover, I see no beneficial preclusive effects from today's decision, and we certainly are not serving the interest of judicial economy if the chances are excellent that both the district court and this court will again be called upon to address the sole dispute between the parties--the assumability of the lease. Thus, none of the relevant factors that we identified in the Meyertech case favor an exercise of jurisdiction in the situation before us.
 
 
 31
 In this case, the debtor filed a motion for leave to assume a lease and the bankruptcy court partially decided that request. In the Brown case, the debtor filed an application for an award of damages against a creditor for violating the automatic stay, and the district court decided that an award was appropriate. It remanded, however, for an assessment of the amount of the damages. This court refused to review. Our observations there are equally pertinent here:
 
 
 32
 In this case, the debtor brought an action against the creditor seeking damages for a violation of the Bankruptcy Code. The bankruptcy court's decision on the issue will not impact upon the distribution of the debtor's assets. Requiring the parties to resolve fully this dispute does not present the threat of a later appeal undoing years of bankruptcy proceedings.
 
 
 33
 To expand the concept of finality to this case would involve an unwarranted step beyond our cases. The district court's order does not affect either the debtor's estate or the other creditors involved in the bankruptcy proceeding. Therefore, we hold that where a district court's order does not affect the distribution of the debtor's assets or the relationship among the creditors, the traditional finality requirements must generally be satisfied before the order is appealable.
 
 
 34
 As I read the court's decision today, it rests upon an assumption: if we assume jurisdiction and decide whether there is an existing lease, MSI will be able to "shop the lease," and this will hasten the day when it can be determined whether a reorganization is feasible. This is at least a debatable assumption and the court makes it without the aid of anything in the record. I think it likely that the contrary assumption is the correct one. The parties and those with whom they may deal want to know whether the lease is assumable; that is the issue the resolution of which may conceivably be crucial to the feasibility of reorganization. While a final resolution of the existence of the lease issue may increase to some degree the ability of the parties to predict how that crucial issue will ultimately be decided, the same can be said for any partial resolution of an issue and substantial uncertainties will remain after today's decision.
 
 
 35
 I would refuse to hear this appeal on the authority of Brown. I believe that result would be consistent with our existing circuit jurisprudence.[1] I find myself in the minority on that score, however, and feel compelled to urge that today's decision be reviewed by the court in banc. I agree with Judge Hutchinson's concurring opinion in In re BH & P, Inc., 949 F.2d 1300 (3rd Cir.1991); it is time for our court to review our jurisprudence and give some content to the concept of finality in bankruptcy cases. The current situation is intolerable. Surely the appealability of an order should not turn on what the majority of a panel may speculate about the shopability of a lease the assumability of which remains in doubt.
 
 
 36
 In our eagerness to be flexible and to facilitate reorganizations where they are possible, I fear we have created a situation in which conscientious bankruptcy practitioners will opt to file an appeal from any order that anyone down the line might argue to be "important." Federal Rule of Appellate Procedure 4(a)(1) provides that "in a civil case in which an appeal is permitted as a matter of right from a district court to a court of appeals, the notice of appeal shall be filed ... within 30 days after the date of the entry of the judgment or order appealed from." Thus, if an order deciding any component of a merits issue is a final order and if Rule 4(a)(1) and section 158(d) are read literally, the losing party would appear to be required to appeal immediately or lose the right to appeal. While a literal reading may ultimately be determined to be inappropriate, there is no case in the Third Circuit, or apparently elsewhere, that so holds.[2] Until that issue is authoritatively resolved, careful lawyers may be unwilling to assume the risk that a later opportunity for an appeal will be available. Indeed, it may be that counsel for GPA felt he had no choice but to file an appeal even though he accurately perceived that everyone would be better off to wait until the bankruptcy court had decided the pending motion.
 
 
 37
 For these reasons, I respectfully dissent and ask that this matter be reviewed by the court in banc.
 
 
 
 [1]
 The timing dispute involves § 4 of the Agreement, which discusses the commencement of rent, and § E-12 of Schedule B to the Agreement, which addresses non-liability for delay in negotiating for kitchen space in the parking garage. Section 4, broken out by sentence, provides:
 SECTION 4 TERM OF LEASE--
 
 
 [1]
 The rights, duties and obligations of the Tenant and Landlord ... shall be effective upon the execution [of the Lease Agreement], except that the Tenant's obligation to pay rent ... hereunder shall commence on the day on which the Tenant shall open the continuous conduct of its business on the Premises, such day being not greater than thirty (30) calendar days after the Use and Occupancy permit for the Leased Premises is issued by the appropriate local governmental agency ..., and shall end [20 years later]
 
 
 [2]
 Landlord agrees with Tenant that ... it may commence its restaurant business in certain parts of the Leased Premises, ... prior to the completion of the changes ... contemplated by the Lease Agreement and the Addendum
 
 
 [3]
 Tenant, in the event it does commence said business in said certain parts of the Leased Premises, shall not be deemed to have "open(ed) the continuous conduct of its business on the Premises", as those terms are used herein, until such time as it has fully occupied all of the indoor portions of the Leased Premises, has available in working order the kitchen and other facilities required for the servicing of those indoor portions and has made them fully available for the continuous conduct of its business, such day being not greater than thirty (30) calendar days after the Use and Occupancy permit or permits for the entire Leased Premises have been issued by the appropriate local governmental agency ..., or December 31, 1984, whichever first occurs
 
 
 [4]
 Tenant, in the event it does so commence said business in said certain parts of the Leased Premises, shall pay to the Landlord six percent (6%) of the Gross Sales ... as rent until such time as Tenant "shall open the continuous conduct of its business on the Premises" ... at which time the Term of this Lease Agreement shall commence and Tenant shall thereupon pay the Fixed Minimum Rent
 
 
 [5]
 The provisions of this Section shall be self operative
 
 
 [6]
 However, upon determination of actual date of commencement of term of this Lease Agreement, both Landlord and Tenant agree to execute a memorandum consistent with the terms hereof setting forth the exact commencement date and the exact date of termination of this Lease Agreement
 
 
 [7]
 [last sentence deals with renewal rights, not relevant here]
 Lease Agreement, § 4 (emphasis added).
 
 
 [2]
 Both leases ran for 20 years, with a possible extension of 9 years, 11 months
 
 
 [3]
 Section 365 provides that, "subject to the court's approval," the trustee "may assume or reject any executory contract or unexpired lease of the debtor." A consideration in determining to assume or reject such a contract or lease would be whether or not assumption or rejection would be beneficial to an effective reorganization. See In re Whitcomb & Keller Mortg. Co., 715 F.2d 375, 379 (7th Cir.1983) (the trustee or debtor in possession is allowed under § 365(d) a reasonable time "within which to determine whether adoption or rejection of the executory contract would be beneficial to an effective reorganization")
 
 
 [4]
 The bankruptcy court found that, although rent was to have started on January 1, 1985, Schedule B, section E-12 of the Agreement excused the start date for a reasonable time due to the delay in negotiating for kitchen space with the Parking Authority. We note that it is not apparent from the record whether MSI ever made this argument to the bankruptcy court. Schedule B, section E-12 provides:
 If, in the course of Tenant's negotiations with the appropriate authorities concerning Tenant's proposed occupancy and use of part of the Third Avenue Garage, as described in the Addendum, delays should occur in reaching a result satisfactory to Tenant respecting such use or the work to be done by Tenant in said garage, any such delay or failure in connection therewith, whether due to actions or omissions of Tenant, shall be free of any liability from Tenant to Landlord for any such delay or failure.
 Lease Agreement, Schedule B, § E-12.
 
 
 [5]
 We note that MSI raised a claim, not addressed in the bankruptcy court's opinion, that the parties orally agreed to extend the commencement of rent until July 1985, though GPA had been unwilling to commit this excuse to writing. See Trial Transcript, Mar. 19, 1987; App. at 862, 876, 877, 879, 881 (testimony of Gaffney, MSI's attorney)
 Interestingly, in MSI's Complaint in Equity filed with the Pennsylvania Court of Common Pleas in March 1985 (filed to stop GPA from notifying Borg-Warner that MSI had failed to pay rent), MSI appears to admit, contrary to its current assertion that rent never became due under the Agreement, that the parties contemplated the commencement of rent as of January 1, 1985, and only later orally extended the date to July 1 of that year. Compare p 17 ("[GPA's attorney] and [MSI's attorney] then discussed plaintiff's request ... that the commencement date of rent payments be changed to July 1, 1985 from the date set forth in the Lease, namely, December 31, 1984") with p 18 ("[GPA's attorney] advised [MSI's attorney] that [GPA's project manager] did not want to then set a precise new date for the commencement of the rent but that defendant would not hold plaintiff to the payment of the rent on January 1, 1985 but would wait until July 1, 1985 to see how the project was progressing before requiring payment of rent").
 MSI was thus caught in a difficult position by the bankruptcy judge's holding. MSI did not want to concede that rent was to have commenced on December 12, 1984, yet it did want the benefit of the bankruptcy court's overall holding, viz. that GPA improperly terminated the lease. In its brief to this court, MSI changed its argument to reflect the bankruptcy court's rationale, conceding that "December 31 was the date that activated MSI's duty to pay rent", but that other parts of the Lease relieved MSI of that duty. MSI made no mention of an oral extension of the rent date before this court.
 
 
 [6]
 We believe it would not advance judicial efficiency as far as the bankruptcy court is concerned to delay an appeal until the question of assumability is decided in that court and then have this court hold, potentially, that the lease was rightfully terminated by Glass Plaza before the bankruptcy
 
 
 [7]
 Judge Alito would affirm. Judge Roth would reverse on the ground that the parties' actions and writings contemplated that rent would commence on January 1, 1985
 
 
 [1]
 One can argue that such a result would conflict with F/S Airlease, but I think the argument is ultimately unpersuasive. In F/S Airlease, the bankruptcy court, acting nunc pro tunc, approved the employment of an agent and awarded the agent a $450,000 fee. Its order was unquestionably a final one (in the sense that it finally determined the propriety of the agency and the fee) and had a large and immediate financial impact on the debtor's estate and the possibility of reorganization. The district court held that the bankruptcy court had properly approved the employment of the agent but that the $450,000 award was insufficiently substantiated. It thus finally determined the propriety of the agency but remanded for reconsideration of the amount of the fee. We found that the portion of the district court's order approving the agency was "final" and therefore reviewable despite the fact that the issue of the amount of the fee had been remanded. We did so because "the payment of some fee to [the agent] could transform this Chapter 11 reorganization into a Chapter 7 involuntary bankruptcy [and] the fact that determination of the disputed issue may require conversion from one under Chapter 11 to one under Chapter 7 demonstrated that, '[t]he matter ... is not one that can await final resolution of the bankruptcy proceedings.' " 844 F.2d at 104. In the case before us, no court has ever entered anything resembling a final order. Moreover, I certainly am not suggesting that an appeal should await the final resolution of the bankruptcy proceedings; an order finally determining the assumability of the lease will do. Finally, the record here does not support a judicial determination that the existence of the lease will have an effect on the estate equivalent to the threatened Chapter 7 conversion in F/S Airlease
 
 
 [2]
 Rule 4(a)(1) perhaps can be read to require only that any appeal from the "final" order be taken within 30 days and not to foreclose an appeal from a subsequent order that is "more final" with respect to the issue in dispute. By way of analogy, courts of appeals have read 28 U.S.C. § 1291 (conferring jurisdiction generally to review final orders of the district courts) and Rule 4(a)(1) together to require that orders deemed final under the collateral order doctrine be filed within 30 days but not to foreclose subsequent appellate review after the entry of an order terminating the entire proceeding. See authorities collected in 15A Wright, Miller & Cooper, Federal Practice & Procedure, § 3911, p. 359 n. 78